We hear our first case for today. We have a ceremonial admission to our court. I'll turn the microphone over to Judge Hughes, who I believe has a motion for us. I do. Thank you. I am very pleased to move the admission of one of my law clerks, Michelle Ma. I am also, of course, sorry because that means she's leaving me and going back to California, which I know she's happy to do and not continue flying back and forth. Seemingly every weekend, but I will miss her. She's been an awesome clerk. So with that, I move the admission of Michelle Ma, who is a member of the Bar and is in good standing with the highest state, highest court of California. I have knowledge of her credentials and am satisfied that she possesses the necessary qualifications. Any objections? Very good. Well, we're very happy to have you as a new member of our Bar. I have doubt after having worked with Judge Hughes that you will be an excellent new addition. So please turn to the court deputy and he'll swear you in. Raise your hand. Do you solemnly swear or affirm that you will support yourself as an attorney and counsel of this court, uprightly and according to law, and that you will support the Constitution of the United States of America? Welcome to the Bar of the United States Court of Appeals. Okay. Our first case for today is 2015-2012, Nova Transforma versus Sprint Spectrum. Mr. Baker, please proceed. In Alice, the Supreme Court told us that the claims in Deere were patent eligible because they improved an existing technological process. In this court, in Enfish and Bascom, applied that same principle to uphold the validity of the patents that were at issue in those two cases because they likewise improved an existing technological process. And the same analysis applies here. The specification of the 034 patent specifically acknowledges that communication systems already existed which converted a message from one media to another media. In other words, that concept was already known. But the patent points out that there were some problems with those existing technological prior art approaches. And in particular, it describes certain improvements that should be made to improve the prior art systems. And one problem it identifies is the fact that media conversions were performed only after delivery of the message to the recipient, which prevents the sender from taking advantage of tariffs and competitive service offerings. Another problem it identifies was that the prior art systems failed to provide any notification to the sender when the payload was delivered to the recipient. So the inventor proposed several specific improvements to the systems of the prior art. One improvement was to allow media conversions to be performed before the delivery of the message and also to allow control over the location where the conversion is performed. Another improvement described in the specification is providing automatic notification to the sender when the recipient has received the message. And those improvements are not just described in the specification, but they're also recited in the claims of the patent, in the asserted claims. And notably and significantly, I mean, wasn't automatic notification well known? You're providing a computerized version of it, but previously you could send a package through the postal service or UPS or anything and get a return receipt. It was automatic. When the package got delivered, you signed it. They took it away, got it sent back. Isn't your invention on that point just a computerized version of it? Well, I think there's two points of response to that. One is there's no evidence in the record that automatic notification was used in these kind of electronic communication systems. Yeah, but that's not enough. I mean, that's the problem that we've had in these cases, particularly when you all come in and argue DIR. You know, just doing something that was done in the ordinary course of business and computerizing it doesn't make it solving a technological problem. It uses a computer to make something more efficient in the regular business world, and there's a distinction there. I think that's right when it comes to looking at what is the fundamental idea of the patent and what it's directed at. But when it comes to looking at whether there's an improvement that's claimed, I think it is appropriate to look at what the prior art did and how the patent describes the invention. So you're telling us that we should look at step two on this case instead of step one? I think that's really one way to look at it. You know, in EnFish, they look at the improvement of the prior art as part of step one, and Baskin looks at it under step two. So I think it could be appropriate under either step. The other point I would make, Your Honor, is that the patent examiner specifically allowed the claim after this limitation was added. After the limitation reciting, providing automatic notification to the sender was added, that's what distinguished over the prior art ultimately and allowed the claim to issue. So the examiner believed that that feature was not obvious, let alone routine and conventional. I'm not sure how helpful that is to you. I'm not addressing the 101 issue. I'm addressing the issue about whether that particular feature was routine and conventional. And the fact that the examiner allowed it suggests that it was certainly not. In other words, if the examiner thought that was obvious, he wouldn't have allowed the claim to issue. And if it's not obvious, of course, it couldn't be routine and conventional in these types of communication systems for And also, the automatic feature of it was what was of particular importance, that in the scenario you're talking about, Your Honor, where you could send a certified letter and get a return receipt in the mail, that's not an automatic return notification of delivery. That involves manual intervention. And that was one of the features of the claimed improvement, was providing this In a recent opinion in electric power, there's some discussion of a distinction that has appeared in a number of cases. Something like, you can't just say, here's a result, it would be good to have, I claim the result. You have to cross the line and say, identify something that would properly sensibly go under the heading of how, some advance in how to achieve something. How would you apply that distinction to this case? Well, I think the first thing I would point out is that in a close reading of electric power, the court first looked to see the what, what was there before looking at the how. And it looked at the what, instead in that particular case, the what was insufficient because it involved rendering the information to be humanly comprehensible. And held that that was not sufficient because that was still an abstract idea. It was only at that point the court then looked to see if there was a how there. And so I think that in the first instance, the current case is distinguishable because what is described is sufficient to be non-abstract improvements to the prior art. What specifically, concretely is described about how there would be a protocol conversion or some of the other things that, I mean, you want notification, but you don't say how to give the notification. If it's crossing different legs of the transmission required, different protocols or media, you say, let's do that. Without saying how. Well, it does show it, Your Honor, in figures, I believe it's figures eight and nine at least. It shows the confirmation message being sent back after there is a successful delivery. It shows that when the message can't be delivered in the first format, there is a delivery failure notification that's sent and then a new media notification is sent that then causes the remote server to use what's described as the media protocol converter to convert the message to a new indication that causes a conversion to take place and also the process that's used to provide a delivery confirmation once the message has been received by the recipient. So it is discussed in a number of the figures and in the description of the architecture of the system, which has an input manager, the output manager, the media protocol converter. So there is a discussion of the technology and the specification. And I don't think there's any requirement that all that detail... What kind of detail is given here about the media protocol converter? Or is it just, you know, a name defined entirely by functionality? Well, it talks about the functionality, talks about the different types of media can convert between, but it doesn't go into the details about how to actually perform that conversion. Is that because there were such things were around? Yes, yes. The prior art already had media converters, right? That I guess is kind of the focus. Why is that not using conventional equipment to carry out their conventional functions? Because the improvement is not in a better way to perform that conversion. The improvement is in other features around the conversion, in particular, where to perform the conversion. Just like in BASCM, one of the key points of novelty was the location where the content filtering was taking place. And this court held that putting that filtering in a new location was an improvement and made it patent eligible. And the same thing applies here, that in the prior art that's discussed, the conversion was done after delivery of the message to the recipient's computer, whereas the patent describes that it's an improvement to be able to do it somewhere else, be able to do it within the network, and to be able to control the location. And so that's part of the improvement. It's not how the conversion itself is done, but the ability to control where it's done. That's the improvement, Your Honor. Are you disputing that the claims cover manual delivery to a recipient? The bulk of the patent and the problem that's described and the solution that's described talks about conversion from one electronic format to another electronic format. There is one paragraph in the patent which talks about what I would consider an additional feature to be able to deliver the message in a hard copy format. Which one paragraph is that? I see multiple paragraphs that talk about hard copy delivery formats. Which one paragraph are you referring to? I am referring to paragraph on column 9, the paragraph starting in line 38. Yes, the in general paragraph where it talks about an email or fax is sent where manual delivery to the recipient is effectuated and notification occurs when delivery is done. That's what you're talking about? Because again on paragraph 8, it talks about using the United States Postal Service for delivery to postal addresses. And this is in the discussion of the payload delivery system as well, right? So on paragraph, I'm sorry, column 8, right around line 40-ish, for delivery to postal address, we use the U.S. Postal Service. Once the users generate a particular payload, the communication can be sent by merely selecting the name of the recipient from the database. And so this will be provided, delivered by the U.S. Postal Service. So it seems like there are multiple places in this patent where it talks about manual delivery, including by the United States Postal Service, falling within the parameters of at least what's disclosed and I think arguably the breadth of the claims as well. Is there some limitation in the claims that you think excludes these routine and well-known forms of manual delivery? I mean, certainly didn't invent the Postal Service. Well, I think it's important to keep in mind, Your Honor, that even in the case where they're talking about ultimately having a physical letter delivered via the Postal Service or UPS, the message originates as an electronic communication and it's transmitted as an email or as a fax to the remote location, the point of presence, as it refers to it, where it can then be printed out and delivered. So it's not simply... But that is the conversion. The conversion is printing it out and delivering a physical copy. There isn't a different conversion in those examples. It's not like it started in ASCII code and was translated into English. That's not the translation that we're talking about. The translation and or conversion is simply printing it out and creating a physical or tangible copy and then walking it over and handing it to someone, correct? In those examples. I'm not saying in the claims. I'm saying in those examples in column eight and column nine in the spec. I think that's one of the conversions. I think the patent... What other conversion in those examples? The patent suggests or states that a message... Where are you reading from? This is in column nine, Your Honor. Starting around line 38, the user initially creates a message for delivery. The user then sends the message. The message is received at the output. The message is printed out and then it goes on. Is there any other conversion? Yes. It says then an email or fax is sent to this point of presence. Presumably, for example, the user didn't create a fax. The user created a message. So the conversion, that's exactly what I was hoping that you would explain to me. So in this scenario, you think the conversion is between the message that is created by the user and the email or fax. That's correct. There's some sort of conversion, but there's no description of the technology that performs the conversion, how the conversion is performed, what particular conversion is performed or anything else, right? It's just you can get a message and we don't even know what form that message is in, in this example. You get a message. The user creates a message. Then an email or fax is sent. And so you're saying there's a mysterious conversion that takes place where this patent doesn't even have a black box that says converter, but there is a mysterious conversion that takes place in this example. I believe that's correct. And I think the lack of specificity here reflects the fact this is not a focus of the patent. This is an additional feature that, in addition to solving the fundamental problem of controlling the location of conversion and providing an automatic delivery notification, this is just an additional feature that's described. And the fact that the patentee threw in this additional feature shouldn't detract from the fact that there is a specific improvement described over the prior art electronic communication system. What's the specific improvement? I'm sorry. I thought the conversion was the specific improvement. So what is the specific improvement? No, no. The conversion is already in the prior art. That's described, Your Honor, at the bottom of page... I'm sorry, column one. But what is the specific improvement? Because I think I've missed it. There's two specific improvements, Your Honor. One is controlling the location where the conversion occurs. And how does this claim control the location at which the conversion occurs? Claim 23 says converting said payload to an alternative media at different locations that's necessary for completion of delivery. How does that narrowly control the location at which conversion occurs? When the patentee added the phrase at different locations during prosecution, the patentee explained to the examiner that meant that it controls the location of conversion. And that's what distinguished over the INIS reference in the prior art because INIS did not control the location of conversion. I don't understand. I'm sorry. Maybe more to the point, that's an agreed-on claim construction here. Well... Is that right? I wouldn't say it's an agreed-on construction. The basis of the district court's ruling was accepting your claim construction. Yes, that's correct. We argued the proper construction of at different locations based on the arguments the patentee made in the file history. Was controlling the location of conversion and the district court said, I will assume that for purposes of the ruling. That's correct. But the district court... Even though the language is... I agree the language on its face doesn't clearly suggest necessarily controlling the location of conversion. But that was what the applicant argued during prosecution. And specifically said, that's what the prior art didn't do. It didn't control the location of conversion. So we think it's entirely appropriate to construe that term that way. Well, we've used all your time, all your rebuttal time, and we're a minute and a half beyond even that. So why don't we hear from the other side and I'll restore two minutes of rebuttal time. Okay. Thank you, Your Honor. Good morning, Your Honors. May it please the court. The district court's judgment here, we respectfully request should be affirmed because the claims at issue here simply fail the two-part Alice test. First, the claims clearly are directed to an abstract idea. The district court found that that idea was translation. And secondly, there is nothing when you review the claims that provides any sort of inventive concept. It's simply a repetition and recitation of more abstract ideas without anything that transforms the abstract idea into something that's patentable subject matter. On the assumption that the claims which the district court indulged require the sender to control the location of conversion along the way, why is that not enough? That is simply, Your Honor, an abstract function. That is saying control something, control location. But there is nothing in the claims that says how to do that. It doesn't provide any sort of change to a network, to a computer. There's no algorithm. There's no data structure. Nothing that says, this is how you're going to control that. It simply says to do it. And that's why, even if you look at just the inventive concept prong, the second part of the test, it's still simply an abstract idea because there's nothing that tells you how to do that. It's a command that says do it. But there's nothing in the claim that says how. And that's really... Is there anything in the spec that says how? In terms of a technical solution, the answer is no. Because what the specification talks about and what the patent is really about is, it's conceding that conversions are done. It's conceding that messages are delivered, messages are sent, notifications are sent back. All of this is known. And essentially, the patent is saying, all right, a message is sent, it's delivered, and there's conversion. But all of those technologies were known. There's nothing that says do it differently. And in fact, Your Honor, the specification says several times that the technologies at issue here are purely conventional. And we can see that, for example, at A30, which has column three lines around 15 to 20, which essentially says that the hardware suitable for implementing the present invention includes, and it lists a number of things, network interfaces and the like, that are well known in the industry. And column six, in describing figure two, says that the computer architecture illustrated in figure two is well known in the art and provided merely for purposes of describing the present invention. Is that architecture point the point that distinguishes this from Bascom? I don't recall that. So tell me, I mean, in Bascom, was there new equipment or just relocation of certain functions from one node in the network to another? Your Honor, I believe more the latter. But I think that the claims actually were very different than the claims here. Because in Bascom, certainly there were servers, and there were internet service providers. But what that patent was about, and I think importantly what the claims recited there, was that you would locate the filters at the ISP, which was something that was different. And number two, you would include logic at the ISP that was customized to filter for specific end users. So what the claims in Bascom were about were actually making improvements to the filtering. And the claim said, how do you do that? It said, locate the filter at the ISP, include logic at the ISP that's customizable for the specific individual end users. And we don't have anything like that in the claims. What we have is something that says, essentially, generate a payload, determine parameters for sending it, convert it as necessary, and then once it's delivered, send a notification back. Those are simply high-level functions, and they are not in any way changes to the claims, improvements to technology, as was the case in Bascom. So what we have with respect to that by any of the jurisprudence developed over the last several years is certainly abstract. We have nothing that tells you in the claims how to do the conversion, how to do the delivery, any of that. We certainly don't have anything that talks about any improvements to computer technology. We have instead a claim that focuses on conventional business activity, the certified mailgram, for example, from Western Union from the 1970s, where you have a message, it's converted to a telex, it's then sent to a post office, it's converted again, it's then delivered, and a notification is sent to the sender that delivery's been accomplished. That is a conventional business activity, and the claim is focused on precisely that kind of activity. And certainly the activity at issue here, I'm sorry, the claims and what's recited in the claims here, certainly these steps can be performed by humans. Humans generate messages, humans set delivery parameters, humans convert messages, humans provide notifications of delivery, all of this is certainly demonstrates that it's abstract. And we certainly don't see anything in the claims that provides any sort of inventive concept that would take it outside of an abstract idea. We instead, as we just illustrated in the discussion of Bascom, have a recitation of what to do, but in no way how to do it. And I think that it was telling in response to the discussion earlier in the questions about electric power, where the question was raised about in electric power, there was a focus on what is in the claims that explains and recites how to do something, the response from the appellant was to look at the specification. And nothing was pointed out to the court with respect to the actual claims and the actual claim language. With respect to manual delivery, if I may just briefly address that, there's no question but that the claims cover manual delivery of messages. And we know that, for example, because Claim 28 provides that you convert a payload and you convert it from a first media into a sealed security letter. So the claims have to be broad enough to encompass the dependent claim and Dependent Claim 28 covers converting a first payload into the sealed security letter. So that has to be encompassed within the notion of delivery. That in turn, I submit, informs what it means to do something automatically. Because if the message is delivered manually, then there has to be something manually that's done in order to provide the automatic notification. So automatic notification here isn't simply, ah, a computer does something and there's this great algorithm that does it. That's not what's happening here at all. The claims certainly are broad enough to cover manual activity, something that's manually initiated. The United States Postal Service makes a delivery. Then a human being will have to do something to cause the notification to be sent back. So there's simply nothing in the claims that provides any sort of inventive concept. This is directed towards regular business activities and regular human activities. If the Court has any questions, I'd be happy to answer them. Okay, Mr. Popro, thank you very much for your argument. Mr. Baker, your two minutes of rebuttal time. Thank you, Your Honor. I would just point out the procedural posture of this case is on a Rule 12 motion. The patent itself describes the prior art. It describes certain improvements that it's making to the prior art. And the case law of this Court and the Supreme Court tells us to look to see whether the claims are reflecting an improvement to the prior art. And the patent itself reflects that. And that should be sufficient to show that it meets the requirements for patentability. I still don't understand what you think is the improvement to the prior art, setting aside the automatic return receipt or whatever, because I think you lose on that. The conversion, what is an improvement there over the prior art or what did you invent? Yes, so I can explain that. If you want to look at it further, it's described. I think if you can explain it in a sentence or two clearly, it might help your case. But I don't get beyond you saying you create a message, the invention determines which format to send it in. So in the prior art, if a conversion had to be done in order to have the recipient be able to So the message, in other words, made all the way to the far end and then was converted. The improvement or one of the improvements is being able to do that conversion at more than one place in the system and to be able to control where... By the system, you don't just mean a computer system, you mean people and various things throughout. No, no, I mean a network. If you look at figure one, there's a network shown here on it. And the pattern talks about how the conversion mechanism can be located all these different places, all these different devices, the local switch, the server, the server, the other local switch, and it can control where the conversion happens in order to get certain benefits to take advantage of tariffs and special offerings and for load balancing purposes. So there's a lot of advantages. You're using a lot of fancy words, but let me give you this hypothetical. When I was in private practice, during the period when we were transitioning between text and written letters and emails, it was a common practice for us to, when we wanted to send a message, send an email, letter form, send that by mail, and also print it out and fax it. So I controlled the conversion and sent it in various ways and got through the system to make sure it got to the individual in a format that he or she could accept because I might not know if that person's email address was actually any good or if they were checking it or if their fax machine was working. As a fail-safe, I wanted to get it there through the mail. I don't see how your invention does anything more than that except on a computer. Well, I think at least one key difference is that it's not sending it in lots of different formats simultaneously. It's sending it in a first media, and if it cannot deliver it in that media, it converts it to a different media, and it can control where to perform that conversion. Okay, but that doesn't make much difference. I don't want to take up too much time, but say I send an email and I get a delivery failure and I say, oh, he didn't get it. Then I send a fax, and I didn't hear from the person within an hour as I expected, so I send a letter or I call them and orally tell them the message. Isn't that doing the same thing? I'm deciding because the first message didn't go through to convert it to a different format. Well, I think for most of these cases, you can always find some human analogy to what's an issue in the patent. Here, there's a prior art system that's described, and it describes an improvement to it, and if it's improving the prior art, that is what the court's cases say is the touchstone for patentability. But not if the prior art wasn't eligible either. That's an interesting question. I don't think the cases say that. I think the cases say if it's a technological process that's existing and you're improving it, that's a non-abstract improvement. That is a real technological improvement that should be patentable under Section 101. Okay, Mr. Baker. We're well beyond the time. I think we have the arguments by both counsel. I thank both counsel, and the case is taken under submission. Our next case for today is 2016-1146, Endo versus Activist. Thank you.